CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

08/21/2019
JULIA C. DUDLEY, CLERK
BY:    s/ F. COLEMAN
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | |
|---|---|
| **KATERA T. O/B/O** | ) |
| **J.B., a minor child,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 6:18-cv-25** |
| | ) |
| **ANDREW SAUL,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Plaintiff Katera T. ("Katera"), on behalf of J.B., a minor child, filed this action pro se challenging the final decision of the Commissioner of Social Security ("Commissioner") finding J.B. not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Katera alleges that the Administrative Law Judge ("ALJ") erred by finding that J.B. was not disabled and failing to award benefits, and included additional evidence for the Court's consideration in her brief. I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. No. 15).

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Katera failed to demonstrate that J.B. was disabled under the Act. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Katera, J.B.'s mother, applied for SSI on J.B.'s behalf on February 21, 2014, when he was seven years old, claiming that J.B. was disabled beginning on December 1, 2013, when he was six years old. R. 90. Katera alleged J.B. was disabled due to attention deficit hyperactivity disorder (ADHD). Id. The state agency denied Katera's application at the initial and reconsideration levels of administrative review. R. 90–107. On August 9, 2016, ALJ Mary Peltzer held a hearing to consider Katera's claim. R. 66–86. Counsel did not represent J.B. at the hearing, but Katera testified on J.B.'s behalf. R. 66. On September 29, 2016, the ALJ entered her decision analyzing J.B.'s claim under the three-step process for individuals under age eighteen and denying his claim for benefits. R. 31–52.

Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Social Security regulations provide a three-step sequential evaluation process for determining whether a minor is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the claimant is engaged in substantial gainful activity; if so, the claimant is not disabled. Id. § 416.924(a), (b). Next, the ALJ must determine whether the claimant suffers from "an impairment or combination of impairments that is severe"; if not, the claimant is not disabled. Id. § 416.924(a), (c). To qualify

as a severe impairment, the impairment must cause more than a minimal effect on the claimant's ability to function. Id. § 416.924(c). If an impairment is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," then it is not severe. Id. If the claimant has a severe impairment, the analysis progresses to step three, where the ALJ must consider whether the claimant's impairment or combination of impairments meets, medically equals, or functionally equals a listing. Id. § 416.924(a), (d). If the claimant has such an impairment, and it meets the durational requirement, the claimant is disabled. Id.

In her decision, the ALJ concluded that J.B. had not engaged in substantial gainful activity since February 21, 2014, the application date. R. 34. She determined that J.B. has the severe impairment of ADHD. Id. The ALJ determined that J.B. does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment, specifically considering listing 112.11 (neurodevelopmental disorders). R. 34–35. When conducting this "step three" analysis, the ALJ must consider the following six relevant domains[1] of functioning to determine whether a severe impairment functionally equals a listed condition: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). For a claimant to be found disabled, marked limitations must be assessed in at least two domains or an extreme limitation assessed in one domain. Id. § 416.926a(a). "Marked" limitation is defined as "more than moderate" but "less than extreme." Id. § 416.926a(e)(2)(i). A minor has a "marked" limitation in a domain when his impairment interferes seriously with his ability to independently initiate, sustain, or complete activities. Id. Extreme limitation is defined as "more than marked." Id. § 416.926a(e)(3)(i).

---

[1] The domains "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).

While an extreme limitation is the rating given to the worst limitations, it does not necessarily

require a total lack or loss of ability to function. Id.

Regarding the six functional domains, the ALJ concluded that J.B. had marked limitation

in interacting and relating with others. He had less than marked limitations in acquiring and

using information; attending and completing tasks; and in the ability to care for himself. J.B. had

no limitation in moving about and manipulating objects, or in his health and physical well-being.

R. 45–51. Thus, the ALJ concluded that J.B. was not disabled. R. 52. The Appeals Council

denied Katera's request for review on March 7, 2018. R. 1–6.

## ANALYSIS

Catherine alleges that the ALJ wrongly determined that J.B. was not disabled, and urges

that he be awarded benefits. The Commissioner argues that substantial evidence supports the

ALJ's decision and his RFC assessment.

### A. Medical History

1. Mental Impairments

Katera completed a function report in March 2014 when J.B. was six years old. R. 172.

Katera indicated that J.B. was limited in his ability to progress in learning because he had some

issues with reading, writing, and understanding money. R. 176. She also noted that J.B. had

difficulties paying attention and sticking with tasks; for example, he was unable to keep busy on

his own, finish what he started, work on arts and crafts projects, or complete homework and

chores. R. 189. She wrote that J.B. was also very fidgety. Id. In another questionnaire from

October 2014, Katera indicated that, while in kindergarten, J.B. received special education

services for reading and was in an after-school program for help with his homework. R. 193–94.

She indicated that J.B. was on medication for ADHD, which worked for the school day but made

4

him cry and feel nervous when it wore off. R. 195. Katera later indicated that J.B. is presently on
Vyvanse for his ADHD. R. 343.

The first ADHD diagnosis in the record comes in February 2014 from J.B.'s pediatrician,
Jessica Sallwasser, M.D., who prescribed and continued to manage his medication through June
2016. R. 367, 369, 395, 401. Dr. Sallwasser reported that J.B.'s behavior improved after starting
on the medication. R. 395, 401. Katera herself reported that her own stress was much improved
because she was no longer getting calls at work about J.B.'s misbehavior in school. R. 504. After
J.B. began taking a different ADHD medication some time later, Katera reported to Dr.
Sallwasser that J.B.'s behavior continued to improve and that he was performing well in school.
R. 490. In June 2016, Katera told Dr. Sallwasser that J.B.'s grades were much improved,
especially with the special education services he was receiving. R. 486.

In September 2014, J.B. was evaluated at Horizon Behavioral Health. Katera reported
that J.B. had ADHD, and while medication helped his behavior, she had some remaining
concerns about J.B.'s performance in school and wanted him to receive therapy to develop
coping skills. R. 415. The evaluator concurred in J.B.'s ADHD diagnosis and recommended
family therapy and medication management, after which J.B. began seeing Ralph Chester, M.D.
R. 418, 420. The record indicates that J.B. continued receiving care through June 2016, but
providers noted that they had "limited contact" with J.B. They expressed concern that Katera's
work schedule was a barrier to J.B.'s treatment and that she had issues with appointment
compliance. R. 422, 454, 480–81. Dr. Chester described that when J.B. is off of his medication,
he is "grossly overactive, impulsive, and inattentive." R. 476. Dr. Chester changed J.B.'s
medication in June 2015, and the new medication worked well for J.B. R. 472–73. Dr. Chester
reported that J.B. was stable in July 2015, although there was some indication that Katera was

not properly administering J.B.'s medication. R. 470. Regardless, J.B. was having no side effects with the new medication and was continuing to improve, especially after he took it as prescribed. R. 466, 470. In April 2016, Katera reported that the new medication was "very good," which she continued to report. R. 447, 454, 464. A quarterly review in June 2016 concluded that J.B. had made progress and had reduced his symptomatic behaviors in school, the community, and at home. R. 443.

At the time of the hearing, J.B. was set to begin third grade. R. 73. Katera testified that J.B. repeated first grade, and was still behind in his reading. Id. Katera testified that J.B.'s ADHD medication helps him to get through school days, but sometimes makes him cry. R. 74. While in second grade, his after-school assistance included one-on-one reading and counseling. R. 82. Katera testified that, during second grade, J.B. would have an attitude if he was not performing as well as his peers, and would leave the room, fall on the floor, or push his desk. R. 76–77. Katera had to attend every field trip due to J.B.'s behavior difficulties because he would talk back, stomp, cry, and yell, and had previously gotten into physical altercations with other students. R. 77. About two to three times per week, J.B.'s teacher called Katera when J.B. was acting out and needed to be calmed down over the phone. R. 78. Katera testified that J.B. still has behavior issues; for example, she has to be persistent in order to get him to do his chores, and he has trouble completing his homework. R. 75–76, 81. Otherwise, J.B. is able to dress, bathe, and brush his teeth by himself. R. 75. For hobbies, J.B. likes to play video games and football. R. 82. J.B. testified briefly at the hearing. He stated he enjoys football. R. 84. He did not know his favorite subject in school, but was excited to start third grade and to see his friends again. R. 84–85.

2.  Medical Opinion Evidence

In May 2014, Dr. Sallwasser referred J.B. to Esther Winters, Ph.D. and licensed clinical psychologist, for a psychological evaluation to assess J.B.'s cognitive abilities and learning difficulties. R. 389. Katera reported to Dr. Winters that J.B.'s behavior and school performance were much better after starting the medication that Dr. Sallwasser prescribed. R. 362. Testing indicated that J.B. was in the low average range of intelligence. R. 393. Dr. Winters diagnosed ADHD and recommended that J.B. continue to maintain his medication regimen because of the "significant improvement" in J.B.'s abilities to attend, complete school work, and participate appropriately when taking it. R. 362, 393. She also recommended that J.B.'s academic progress be monitored closely, and that he participate in extracurricular activities. R. 393–94.

In August 2014, Stephen Saxby, Ph.D., reviewed the record for the state agency's disability determination and found that J.B.'s ADHD was a severe medically determinable impairment. R. 93. Dr. Saxby determined that J.B. had less than marked limitation in acquiring and using information. He explained that even though J.B. had an ADHD diagnosis, was a little behind grade level, attended an after-school program for extra help, and required a lot of repetition for instructions and concepts, he was still making progress and his condition improved with medication. R. 94. Dr. Saxby also noted that testing suggested J.B. has a low to average IQ score. Id. Regarding attending and completing tasks, Dr. Saxby found less than marked limitation, writing that J.B. had issues with: information recall, focusing, sitting still, and frustration; getting distracted in large groups of people; being hyperactive while in school and blurting out answers without thinking; and understanding instructions and concepts without requiring repetition. Id. Dr. Saxby also found less than marked limitation in J.B.'s ability to interact and relate with others, and indicated that while sometimes J.B. had an attitude with

teachers and would get frustrated, he was having fewer issues with anger and behaved okay at home. Id. Dr. Saxby found less than marked limitation in caring for himself because J.B. has some difficulty handling frustration appropriately and being patient. Id. Dr. Saxby found no limitations in moving about and manipulating objects, or in J.B.'s health and physical well-being. Id. Finally, Dr. Saxby noted that J.B.'s ADHD symptoms were improving with treatment. R. 95. Dr. Saxby ultimately concluded that J.B. was not disabled. Id.

As part of the reconsideration of the state agency's disability determination, Daniel Walter, Psy.D. and LCP, evaluated the records in March 2015. Dr. Walter also determined that J.B.'s ADHD was a severe medically determinable impairment. R. 103. Dr. Walter adopted the exact same findings as those of Dr. Saxby regarding the six domains of functioning. R. 103–04. Accordingly, Dr. Walter likewise determined that J.B. was not disabled. R. 105.

3.   Education Records

In February and March 2015, J.B. underwent an evaluation by Lynchburg City Schools to determine if he was eligible for special education services. J.B.'s first-grade teacher, Joy Eutsler, evaluated J.B.'s general classroom performance. She had concerns about J.B.'s reading comprehension and noted it was almost impossible for J.B. to sit still and concentrate on reading anything. R. 208. J.B. struggled with writing and spelling, was confused with math, had difficulty sitting still and retaining social studies lessons, and was disruptive in class during movement education because he could not stay on task and had difficulty maintaining self-control or using safe behaviors. R. 208–10. J.B. was very disruptive in music class, talked too much, and was disrespectful and argumentative with the teacher and classmates. R. 210. While he loved art, he was unable to listen to instructions or maintain focus. Id. J.B. distracted other students, interrupted others, and required redirection and individual attention to complete simple

8

tasks. Id. Ms. Eutsler described J.B.'s behavior during field trips as "completely unacceptable."
Id. He ran away from chaperones, could not stand still, tried to "rough-house," and sometimes
hurt other children. Id. He also had a very difficult time following directions. Id. Finally,
regarding his behavior generally, Ms. Eutsler described him as constantly moving, making noise,
and unable to sit still and remain quiet; he would interrupt the teacher, stomp around, and find
everything silly; he lied about stealing students' things and the behaviors of his peers in order to
avoid punishment; and essentially disrupted class instruction "not only on a daily basis but on a
minute to minute basis." R. 210–11.

Adrian Holmes, a special education teacher, completed a Specialist's Education Report
for the evaluation. Behaviorally, J.B. was cooperative, attentive to most of the tasks, and
generally persisted with the difficult tasks. R. 212. He did appear fidgety or restless as the
examination continued. Id. J.B.'s overall academic achievement scores were in the low average
range for reading, low range for mathematics, and low average range for overall written
language. R. 213–14.

Matt Wallin, Ed.S., NCSP, and a school psychologist, observed J.B.'s behavior in the
classroom and noted that J.B. was very hyperactive and impulsive, fidgety and restless, and
yelled, got out of his seat, distracted others, and required redirection to stay on task. R. 215.
J.B.'s overall behavior was significantly more off-task than his peers, and his academic ability
appeared below grade level. Id. J.B. otherwise had good motivation and was eager to do well,
and his mood and affect were age-appropriate. Id. Mr. Wallin conducted a psychological
evaluation in March 2015. R. 406–12. Mr. Wallin stated that J.B. had significant attention
problems and hyperactivity/impulsivity, which may have negatively impacted his test results.
R. 411. He determined that J.B.'s overall social/emotional functioning was mostly age-

9

appropriate. Id. J.B.'s behavioral functioning was impacting his academics to a significant

degree. Id

Finally, in March 2015, Kim Harrell, M.Ed., completed a social cultural report, in which

she discussed more of the same information as that provided by Katera here. R. 429–31.

Lynchburg City Public Schools approved J.B. for special education services in March

2015. R. 225, 228. The eligibility committee noted that J.B. repeated first grade, and his

educational performance is most impacted by his behavioral and attention problems. R. 223–24.

J.B. was provided with an IEP, for which he would receive special education services for math,

reading comprehension, and written language, and he would receive support and accommodation

for his behavior and attention-to-task skills. R. 247–80.

Later in March 2015, Ms. Eutsler, J.B.'s first-grade teacher, completed a teacher

questionnaire for J.B.'s disability application. Ms. Eutsler had known J.B. for one year and eight

months, and saw him every school day for seven and a half hours each day. R. 239. She indicated

that J.B. had problems in acquiring and using information, with his most challenging areas being

with reading or comprehending written material, doing math, learning new material, recalling

previously learned material, and expressing ideas in written form. R. 240. Ms. Eutsler indicated

that J.B. overall has very serious problems with attending and completing tasks on an hourly and

daily basis. R. 241. She also reported issues with interacting and relating with others with his

most challenging activities being seeking attention appropriately, expressing anger, asking

permission, and following rules. R. 242. She indicated that J.B. has no problems moving about

and manipulating objects. Ms. Eutsler indicated that J.B. has issues caring for himself,

particularly with handling frustration and being patient, which occurs on a daily basis. R. 244.

Ms. Eutsler reported that, after J.B. takes his medication, he becomes more calm and focused, is

able to listen to instructions, and does better in reading, spelling, math, and art. R. 245. If he does not take his medication, J.B. talks nonstop, moves constantly, cannot focus, and has general trouble controlling his body. Id.

Ms. Eutsler wrote a letter at the conclusion of J.B.'s repeated first grade year describing that J.B.'s medication and her close work with Katera had "paid off." R. 277. She explained that J.B. had been able to sit, concentrate, and learn, such that "a whole new world" opened up for him. Id. J.B. was learning to read and spell, making progress with math, and his behavior improved so much that he became the child that was offering help and modeling good behavior for his peers. Id.

Over the first half of the 2015 to 2016 school year, IEP reports showed that J.B. was making progress with his special education goals. R. 297–300. His case manager, Ashley Nowell, reported in January 2016 that J.B. continued to improve both academically and behaviorally, and noted that she was proud of his effort to make good choices. R. 300. In April 2016, Lynchburg Public Schools renewed J.B.'s IEP for the 2016 to 2017 school year. R. 306. Ms. Nowell reported continued issues with disruptive behavior and being off-task. R. 318. Academically, J.B.'s scores fell within the low to low average range, but narrative comments show continued improvements academically. R. 321–22, 325–26. J.B. remained inconsistent in his ability to focus to complete activities. R. 325.

### B.  Functionally Equal Listing of Impairments

In her brief, Katera argues that J.B. is disabled because of his anxiety and ADHD, and so he should receive benefits. Pl.'s Br., Dkt. No. 14. She asserts that she has to help J.B. with all of his daily care, and so she has difficulty keeping employment and paying household bills because of how frequently she must attend to J.B. at home and at school. Id. at 2–3. Katera does not

allege any specific errors by the ALJ, instead contending that J.B. should receive disability

benefits because of his ongoing mental health condition. The Commissioner counters that

substantial evidence supports the ALJ's decision as a whole, and the record provides ample

support for the fact that J.B.'s condition responded well to medication and school

accommodations. Def.'s Br. at 7, Dkt. No. 16. Because Katera is proceeding *pro se*, I will

liberally construe her brief as a general challenge to the ALJ's determination that J.B.'s condition

does not meet, medically equal, or functionally equal a listing of impairment. See Erickson v.

Pardus, 551 U.S. 89, 94 (2007).

I find that substantial evidence supports the ALJ's determinations regarding the six

domains of functioning. The ALJ provided a thorough and extensive discussion of the medical

records. R. 36–44. She included in that discussion descriptions of J.B.'s psychological

evaluations with Drs. Winters and Chester, and quarterly reviews from his behavioral health

treatment. R. 37–38, 40–42. More importantly, the ALJ outlined in great detail the evaluations

conducted to determine if J.B. was eligible for special education services, including those by Mr.

Wallin and Ms. Harrell, and the records from J.B.'s IEP meetings and progress reports. R. 38–41.

The ALJ also discussed Katera's testimony and allegations of JB's impairments (R. 35–36, 42–

43), the weight assigned to the medical opinions from the state agency consultants (R. 43), and

her evaluation of the teacher questionnaires and letters from J.B.'s teacher, Ms. Eutsler (R. 43–

44). The ALJ then provided comprehensive analyses of the six domains of functioning,[2] in which

she connected specific evidence to her conclusions and thoroughly explained her reasoning.

R. 45–51.

1. Domain One: Acquiring and Using Information

In the domain of acquiring and using information, the Commissioner considers how well

---

[2] The ALJ analyzed J.B. as a school-aged child (defined as age six to twelve).

a child is able to acquire information and then use the information learned. See 20 C.F.R. § 416.926a(g); SSR 09–3p. School-age children without impairment should be able to learn to read, write, and do math, and discuss history and science, and to use those skills both in academic and in daily living settings. Id. § 416.926a(g)(2)(iv). The child should be able to use increasingly complex language to share information and ideas with individuals or groups, ask questions, express his own ideas, and understand and respond to others' opinions. See id.

In explaining her finding of less than marked limitation in this domain, the ALJ discussed Katera's testimony and subjective reports that J.B. repeated first grade and was behind in reading, but did okay in the second grade. R. 45. Katera also indicated in her function report that J.B. could read letters and understand simple sentences, write his name, spell most short words, add and subtract simple numbers, and tell time, and he knew the days of the week. Id. The ALJ described the medical evidence, explaining that J.B. was initially characterized as hyperactive and distracted with behavioral issues, which was later confirmed to be ADHD, but he had begun responding to ADHD medications by July 2014. Id. The ALJ noted accurately that indeed, J.B.'s performance in school and behavior continued to improve on medication. R. 45–46. The ALJ accurately observed that the grade reports and IEP evaluations showed that he "had steady improvements in his school performance over time," and his latest IEP in the record was only slightly adjusted. R. 46. The ALJ did note that testing showed J.B. had slow academic progress in all subject areas, but accurately observed that the results were an underestimation of his functioning because the examiners concluded that "his significant attention and hyperactivity problems likely impacted his scores negatively." Id. Finally, the ALJ indicated that she concurred with the state agency consultants' findings that J.B. had less than marked limitation in this area. Thus, in light of the entire record and the ALJ's detailed explanation, substantial

13

evidence supports her determination that J.B. had less than marked limitation in this domain.

    2.  <u>Domain Two: Attending and Completing Tasks</u>

In this domain, the Commissioner considers how well a child is able to focus and maintain his attention, and how well he begins, carries through, and finishes his activities. 20 C.F.R. § 416.926a(h). A school-age child should be able to focus his attention in a variety of situations in order to follow directions and complete assignments. <u>Id.</u> § 416.926a(h)(2)(iv). A child without impairment should be able to concentrate on details, change activities without distracting himself or others, and stay on task. <u>Id.</u>

The ALJ found that J.B. has less than marked limitation in this domain. The ALJ again described Katera's testimony that J.B. had trouble completing his homework and received one-on-one instruction in certain subject areas. R. 47. She also indicated in a function report that J.B. could not keep busy on his own or finish a number of tasks, and he was very fidgety. <u>Id.</u> The ALJ discussed how the medical evidence demonstrated that J.B.'s ADHD was treated with medication, which showed positive results, and providers noted at psychological appointments that he was calm and attentive when he was on his medication. <u>Id.</u> The ALJ described J.B.'s IEP records, which indicated that J.B. was still having trouble concentrating and attending to problems such that he required special accommodations and education instruction in certain subjects. <u>Id.</u> The ALJ correctly observed that J.B.'s later IEP reports still noted difficulties with being off-task, but also noted that they indicated J.B. had improved overall in his school performance. <u>Id.</u> Indeed, J.B.'s last IEP in the record before the ALJ was adjusted only slightly. <u>Id.</u> Finally, the ALJ showed that she concurred with the state agency consultants who also found less than marked limitation in this domain. As with the first domain, substantial evidence supports the ALJ's determination that J.B. has less than marked limitation in this domain.

3.  <u>Domain Three: Interacting With and Relating to Others</u>

This domain concerns a child's ability to "initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). A school-age child without impairment should be able to develop more lasting friendships with other children of the same age; understand how to work in groups; have an increasing ability to understand another's point of view and to tolerate differences; and be able to talk to people of all ages, share ideas, tell stories, and speak so that both familiar and unfamiliar listeners can readily understand. <u>Id.</u> § 416.926a(i)(2)(iv).

The ALJ found that J.B. has marked limitation in this domain. The ALJ pointed out that Katera testified that J.B. behaved poorly with others, and had behavioral issues, including an altercation during a field trip. R. 48. However, in her function report, she did not indicate that J.B.'s condition affected his behavior with other people. R. 48, 178. The ALJ explained that the medical evidence demonstrated J.B. had behavioral problems in February 2014 because of his hyperactivity, but responded well to medication by July 2014 and had begun getting along better with his sister. R. 48. In September 2014, Katera reported that J.B. was good at playing, was a good friend, and shared well. <u>Id.</u> J.B.'s February 2015 psychological evaluation showed that J.B. had overall social and emotional functioning that was mostly age-appropriate. <u>Id.</u> However, his conduct problems, inattention, impulsiveness, and inhibition issues were negatively affecting his academics. <u>Id.</u> Because his conduct in the classroom was affecting others, his IEP suggested that J.B. receive small-group and one-on-one attention. <u>Id.</u> J.B.'s March 2015 IEP showed that J.B. still had difficulties with being disruptive in class, talkative with his peers, and disrespectful and argumentative to his peers and teachers. <u>Id.</u> His January 2016 IEP report card indicated that

J.B.'s behavior in this area had improved, but his April 2016 IEP showed that J.B. still had inconsistent and disruptive classroom behavior when he was not on task. Id. Still, Katera reported in May 2016 that J.B. was still doing well with his sister, participated in the church choir, and would be attending basketball camp that summer. Id. The ALJ last observed that the state agency consultants both found less than marked limitation in this domain. Id. However, the ALJ wrote that she gave J.B. the benefit of the doubt by finding a marked limitation because of the "continued reports by school officials of behavioral issues," which accurately reflects the ongoing problems that J.B. had in the classroom setting in interacting with others. Id. Thus, the record supports the ALJ's determination that J.B. had a marked limitation in the domain of interacting and relating with others. Additionally, the ALJ's protracted explanation of her finding in this domain sufficiently demonstrates how she came to her conclusion.

4. Domain Four: Moving About and Manipulating Objects

For this domain, the Commissioner considers a child's gross and fine motor skills, which show how well a child is able to move his body from one place to another and how he moves and manipulates things. 20 C.F.R. § 416.926a(j). A school-age child without impairment should be able to move at an efficient pace in all settings; enjoy a variety of physical activities, such as running, jumping, throwing, kicking, and catching; and use many kitchen and household tools independently, like scissors, and to write. Id. § 416.926a(j)(2)(iv).

The ALJ found that J.B. has no limitation in this domain, which the record amply supports. J.B. plays video games and football, and Katera stated that J.B. has no physical limitations. R. 49. J.B.'s physical examinations at check-ups were normal. Id. Additionally, a number of different providers observed that J.B. enjoyed sports and played them regularly. Id. The ALJ last described that the state agency consultants similarly found no limitation in this

16

domain. Id. Thus, substantial evidence supports the ALJ's determination that J.B. had no limitation in this domain.

5.   Domain Five: Caring for Yourself

Domain five encompasses a child's ability to maintain a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met; how he copes with stress and environmental changes; and whether he takes care of his own health, possessions, and living space. 20 C.F.R. § 416.926a(k). A school-age child without impairment should be independent in most activities of daily living, like dressing and bathing; be able to identify circumstances in which the child feels good about himself or bad about himself; should begin to develop an understanding of what is right and wrong, and what behavior is acceptable or unacceptable; and be able to demonstrate consistent control over his behavior and avoid unsafe behaviors. Id. § 416.926a(k)(2)(iv).

The ALJ outlined and explained the ample evidence to support that J.B. has less than marked limitation in this domain. Katera testified that J.B. is able to dress and bathe himself, brush his teeth, and do household chores. R. 50. In her function report, Katera indicated that J.B.'s condition does not impair his ability to help himself or to cooperate in taking care of his own personal needs. R. 50, 179. The medical evidence demonstrated reports of J.B. exhibiting frustration or having crying spells when not getting his way, but his behavior steadily improved with medication and he attended counseling to help with coping skills. R. 50. The March 2015 social cultural evaluation revealed that J.B. cared for his own hygiene independently, took pride in his appearance, prepared simple meals for himself, knew his way around the neighborhood, and could ask for help when needed, even though he could become upset with failure. Id. J.B. also helped around the home by washing dishes, making his bed, and helping with laundry. Id.

17

The ALJ observed that the state agency doctors found less than marked limitation in this domain, which the ALJ concurred with. Thus, there is substantial evidence in the record to demonstrate that J.B. had less than marked limitation in this domain.

6.  Domain Six: Health and Physical Well-Being

Finally, in this domain, the Commissioner considers the cumulative physical effects of a child's physical or mental impairments and their associated treatments on the child's functioning. 20 C.F.R. § 416.926a(l). The ALJ found that J.B. had no limitation in this domain. Katera did not testify to any significant health problem that J.B. had outside of his ADHD and anxiety. In the function report, Katera indicated that J.B.'s physical abilities are not limited. R. 51, 177. The ALJ accurately described that the medical evidence showed normal physical examinations at appointments. R. 51. Outside of treatment for blood vessels in his nose and a broken collarbone, Katera maintained that J.B. was in excellent health overall. Id. The state agency consultants also found no limitation in this domain, which the ALJ relied upon. Accordingly, there is ample evidence in the record to support the conclusion that J.B. had no limitation in this domain.

Overall, the ALJ's decision contains sufficient information to allow meaningful review, and substantial evidence supports her decision. The Court is not left to guess about how the ALJ arrived at her conclusions because the ALJ's findings include a sufficient summary and explanation of J.B.'s medical records, Katera's hearing testimony and self-reports, the opinion evidence, J.B.'s education records and teacher opinions, and the ALJ's conclusions.

**C.  Post-Hearing Evidence**

1.  Records Submitted to the Appeals Council

Katera submitted additional educational records to the Appeals Council. The first was a behavior report regarding J.B.'s conduct from October 2014 to April 2017. R. 62–63, 87–89. It

18

detailed nine events of J.B.'s misbehavior and the relevant punishments, mostly involving defiance and aggression towards teachers and classmates. Id. Katera also submitted quarterly review records from 2017 from Anderson Counseling Services. R. 19–27. In the October 2017 review, the provider wrote that J.B. still has difficulties controlling his impulsive behavior, obeying authority figures, and implementing coping skills, and J.B. continued to display behaviors that warranted therapeutic support in the school setting. R. 25–26. Lastly, Katera submitted progress reports for J.B.'s IEP for the 2017 to 2018 school year. R. 7–15. J.B.'s teacher reported that he was making progress to grade-level math material, had progressed to reading at his instructional level, and had improved in communicating when he needed breaks and keeping on task for longer periods of time. R. 7–8. J.B. could stay on task for extended periods of time intermittently, but his behavior was extreme (either very engaged or very disruptive). R. 9. Weekly progress reports showed similar problems of hyperactivity, not following directions, and disrespect towards peers. R. 11–13. In response to the additional evidence, the Commissioner argues that J.B.'s functional level did not appreciably change since the ALJ's decision. Def.'s Br. at 8, Dkt. No. 16.

The Appeals Council will review an ALJ's decision if it receives additional evidence that is "new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5) (effective Jan. 17, 2017). The Appeals Council will consider additional evidence only if the claimant shows good cause for not submitting the evidence to the ALJ. Id. § 404.970(b).

The Appeals Council determined that the behavioral report (as it related to events between October 2014 and September 2016) did not show a reasonable probability that it would

have changed the outcome of the ALJ's decision. R. 2. The evidence was new because it detailed

events that occurred during the relevant time period but had not been included in any of the

records before the ALJ. It was material because it directly reflected on J.B.'s behavior in school,

and the ALJ relied heavily upon education records throughout her decision. However, I cannot

find that the Appeals Council erred in determining that the new evidence did not show a

reasonable probability that it would have changed the outcome of the ALJ's decision. While the

specific incidents were not detailed in the ALJ's record, Katera had already reported that J.B. had

incidents like those in the new evidence, and teacher reports elsewhere described this type of

behavior from J.B. The ALJ had sufficient evidence demonstrating this type of behavior already,

and thus her decision would likely not have changed based on the new evidence.

The remaining evidence related to a period after September 29, 2016 (the ALJ's decision

date), and so the Appeals Council determined that the evidence did not relate to the period at

issue. Id. The Appeals Council instructed Katera to file a new application if she wanted the

Commissioner to consider evidence for the period after September 2016. Id. I cannot find that

the Appeals Council erred in making this determination, as the evidence all related to J.B.'s

behavior after the ALJ's decision.

2. Records Submitted to the Court

Katera submitted additional records to the Court in her brief, including: prescription

medications that J.B. is taking as of January 2019 (Pl.'s Br. at 6, Dkt. No. 14); a letter explaining

that he participates in the Therapeutic Day Treatment program at Bedford Hills Elementary

School (id. at 7); one behavior incident record from 2018, while J.B. was in fifth grade (id. at

10); IEP progress reports from January 2019 (id. at 11–14); an IEP addendum dated December

2018 indicating that J.B. would continue to receive special education services (id. at 15–21); and

20

a letter from J.B.'s case manager at New Horizon Behavioral Health and quarterly evaluations dated July 2018 and January 2019 (id. 22–30).

Sentence six of 42 U.S.C. § 405(g) authorizes the Court to remand a case to the Commissioner upon a showing of new, material evidence, for which good cause can be shown for the failure to incorporate such evidence into the record in a prior proceeding. Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985), superseded by amendment to statute, 42 U.S.C. § 405(g), as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs., 925 F.2d 769, 774 (4th Cir. 1991). Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council. In order to remand back to the Commissioner, (1) the evidence must related back to the time the application was first filed, and it must be new and not merely cumulative; (2) the evidence must be material to the extent that the disability decision might reasonably have been different had the new evidence been before the ALJ; (3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant must present to the remanding court at least a general showing of the nature of the new evidence. Borders, 777 F.2d at 955; see also Rollins v. Colvin, Civil Action No. 7:13cv00548, 2015 WL 1275284, at *8–*9 (W.D. Va. Mar. 19, 2015).

The additional evidence that Katera submitted to the Court constitutes new evidence because it all arose following both the ALJ's decision in September 2016 and the Appeals Council's decision in January 2018. There was good cause for Katera's failure to incorporate the evidence into the record during the proceedings because the evidence did not exist until after both decisions. The new records are not material, however, because they do not relate to the time period that was before the Commissioner in this action, and thus there is no reasonable probability that they would have changed the Commissioner's decision. The additional evidence

shows J.B.'s medical treatment, behavioral incidents, and academic performance relating to his condition after the Appeals Council's denial but before Katera submitted her brief to the Court. There is no indication that these records relate back to J.B.'s functional capacity during the relevant period, and this evidence does not undermine the ALJ's conclusion that the records during the relevant period do not reflect that J.B. was disabled at that time. Finally, because the evidence appears to be more of the same in terms of describing the same treatment and behavioral issues as the records before the ALJ, there is no reasonable possibility that the new evidence would have changed the outcome of Katera's case.

## **CONCLUSION**

For the foregoing reasons, I **RECOMMEND** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** the Commissioner's motion for summary judgment, and **DISMISSING** this case from the Court's docket.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive on the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

Entered:  August 21, 2019

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge